Kenya WILSON, Personal Representative of the Estate of Alvin Wilson, Jr., Deceased, Plaintiff–Appellant,

v.

Officer Keith ROBERTS, Officer Alfred Fowlkes, and Officer John Smith, Defendants–Appellees,

No. 02–1561.

United States Court of Appeals, Sixth Circuit.

July 17, 2003.

Before DAUGHTREY and GIBBONS, Circuit Judges, and MILLS,* District Judge.

PER CURIAM.

Before us is an interlocutory appeal from the district court's denial of qualified immunity to three of the defendants in a § 1983 case arising from a jail suicide committed by Alvin Wilson, Jr., husband of plaintiff Kenya Wilson. Flint city police officers Keith Roberts, Alfred Fowlkes, and John Smith contend that their actions were not the cause of Wilson's suicide, that they were not deliberately indifferent to his need for medical attention, and that no clearly established legal precedent mandated them to undertake the preventative measures that the plaintiff contends they should have performed. Because we conclude that a factual dispute remains over whether Officers Fowlkes and Smith believed that Alvin Wilson was suicidal, their appeals must be dismissed for lack of subject-matter jurisdiction pursuant to the dictates of *Johnson v. Jones*, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). We further conclude, however, that the district court's denial of qualified immunity to Officer Roberts should be reversed and that this matter should be remanded to the district court for entry of an order of dismissal as to Roberts and for such further proceedings as are required against the non-appealing defendants, the City of Flint and Genessee County.

## FACTUAL AND PROCEDURAL BACKGROUND

In the hours shortly after midnight on January 8, 2000, Kenya Wilson, then the estranged wife of Alvin Wilson and now the plaintiff and the personal representative of his estate, arrived with the couple's one-year-old daughter at the Flint, Michigan, home of Theodore Ruth, her husband's best friend. Kenya knew that Alvin had been staying at Ruth's residence during the couple's estrangement, but she was surprised and enraged when she discovered a woman with whom Alvin worked waiting for Alvin in his bed. When the disagreement between Kenya and Alvin grew more heated, Alvin physically attempted to prevent Kenya from leaving the house. Eventually, Ruth intervened in the situation, extricated Kenya from the predicament, and sought to restrain Alvin from pursuing Kenya with a firearm. A struggle ensued between the two men and, during that scuffle, the weapon discharged and a bullet struck Ruth in the stomach.

After the shooting, Kenya, Alvin's female friend, and a friend of Ruth's who was also at the house quickly fled the premises, leaving Wilson in the home with his infant daughter and with the injured Ruth. Shortly after 4:00 a.m., Alvin Wilson finally emerged from the house brandishing a firearm. Police officers who had arrived on the scene demanded that he put down his weapon, but Wilson refused. Instead, he raised the gun to his left temple and pulled the trigger. When the gun failed to fire, Wilson pulled the trigger additional times with the same result. Finally, Wilson yelled to the police, "Go ahead and kill me," and walked back inside the house.

Eventually, Wilson released the infant girl to law enforcement officials unharmed. Minutes later, he also dragged Ruth onto

---

* The Hon. Richard Mills, Untied States District Judge for the Central District of Illinois, sitting by designation.

the porch and allowed emergency crews to transport the injured man to the hospital. Unfortunately, however, Ruth died from the injuries he sustained from the gunshot.

As the morning progressed, the police, through negotiator Keith Roberts, engaged Wilson in telephone conversations. In the course of those communications, the gunman repeatedly stated his conviction that he would not be taken to jail again, that he would leave the house only in a body bag, and that he did not desire to live any more. Nevertheless, approximately six hours after the stand-off began, Wilson surrendered to police after receiving certain assurances from Roberts.

Officers Fowlkes and Smith transported Wilson to the Flint police station and submitted their reports on the morning's activities to their desk sergeant. In those reports, the officers detailed their observations of Wilson's activities, including the fact that Wilson pointed his gun at his own head and repeatedly pulled the trigger. Although Flint jail procedures required arresting or transporting officers to inform lockup personnel *verbally* of any "injuries the prisoner may have or any threats, suspicious or suicidal comments made by the prisoner," neither Fowlkes nor Smith did so in this matter, in part because the officers claimed not to have been aware of such a policy,[1] and in part because neither officer believed Wilson to have been suicidal.[2] Consequently, no mention of Wilson's self-destructive comments or actions at Ruth's house were recorded on documentation that followed Wilson through his incarceration.

Likewise, Officer Roberts also did not inform his supervisor verbally of any potential suicide risk because he also claimed to be unaware of any requirement to do so and because he also did not believe Wilson was suicidal. Nevertheless, the evidence before the district court indicates that Sergeant Alan Edwards, who was present with Roberts at a remote location throughout the negotiations with Wilson, verbally informed Sergeant Scott Eddy, in the presence and hearing of Roberts, "that Mr. Wilson was on the porch waving a gun around and threatening people, and that he also threatened himself."

During his stay at the Flint lockup, Wilson was actually housed in the suicide watch area of the jail even though no individual officer claimed that Wilson was indeed suicidal. Rather, according to guard Kevin Ross, Wilson was housed in the more restrictive area of the facility because "[h]e was the first murder suspect lodged [in the new building] and attracted a significant amount of notoriety among the jail guards."

On January 9, 2000, the day following his arrest, Wilson was transported from the Flint lockup facility to the Genessee County jail for arraignment and detention. At the time of his transfer, no information was relayed to county guard Tina Bardwell about the circumstances of Wilson's arrest or about the fact that the prisoner had spent time on the suicide watch unit at the lockup facility. Furthermore, Deputy Andree Williams, one of the county facility's booking officers, knew nothing of Wilson's past problems and, in fact, testified that she saw nothing in his behavior to indicate

---

1. Despite the officers' denials of the existence of such a policy, Lieutenants Antonio Mata and Gary Elford of the Flint Police Department swore in affidavits that they personally provided a copy of the policies and procedures "to every City of Flint police officer."

2. In fact, Smith testified incredibly in his deposition that the *only* actions a person could take to convince him that the person was suicidal were "if they killed their self" or "[i]f they hurt themselves real bad and almost died."

that he was suicidal. Williams further stated that she and other county employees did not even receive training in suicide prevention until *after* the events prompting this dispute.

Because Deputy Williams detected no cause for special treatment of Wilson at the county jail, she directed that he be housed in the general intake population. While so incarcerated, however, Wilson was found smoking marijuana in his cell with another prisoner. As a result, Wilson was transferred to the restricted housing unit of the facility where he remained for most of the next three days. Shortly after 10:00 p.m. on January 12, Wilson was found hanging from an air vent in the ceiling in his cell with a shoelace tied around his neck. Efforts to revive him were unsuccessful, and Wilson was pronounced dead at the hospital to which he was transported.

Subsequently, Kenya Wilson, as personal representative of her deceased husband, filed suit in federal court against numerous defendants. She alleged that the City of Flint, the Flint Police Department, and the chief of police, in his official capacity, failed to train police officers in their charge adequately and failed to have in place adequate policies to deal with suicide situations. Similar allegations were also made against Genessee County, the county sheriff's department, and the sheriff himself, in his official capacity. Kenya Wilson also claimed that Flint police officers Edwards, Roberts, Fowlkes, and Smith, as well as sheriff's department employees Bardwell and Taylor, were deliberately indifferent to Wilson's psychological condition and serious medical needs, and that all defendants were grossly negligent and reckless in their oversight of the decedent. The defendants responded by filing motions for summary judgment, alleging that they were entitled to qualified immunity from suit in this matter.

Following discovery and an evidentiary hearing, the district court granted the motions in part and denied them in part. Specifically, the district judge dismissed all claims against defendants Edwards, Bardwell, and Taylor. The court further treated the claims against the sheriff's department and the sheriff himself as claims against the county only and, similarly, viewed the allegations against the Flint Police Department and the chief of police in his official capacity as suits against only the city itself. Although finding the city and county immune from state law tort claims, the district court nevertheless denied the attempts by those governmental bodies to insulate themselves from the failure-to-train allegations. The court also concluded that issues of fact remained as to whether defendants Fowlkes, Smith, and Roberts truly considered Wilson suicidal and, therefore, whether those defendants were deliberately indifferent to his plight.

### DISCUSSION

The denial of a motion for summary judgment is generally not immediately appealable "because the applicable statute, 28 U.S.C. § 1291, only vests appellate courts with jurisdiction over a district court's 'final decision.'" *Comstock v. McCrary,* 273 F.3d 693, 700 (6th Cir.2001), *cert denied,* 537 U.S. 817, 123 S.Ct. 86, 154 L.Ed.2d 22 (2002). In *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the United States Supreme Court did explain, however, that, pursuant to the collateral order doctrine, "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of fi-

nal judgment." This exception is thus "explicitly limited . . . to appeals challenging, not a district court's determination about what factual issues are 'genuine,' . . . but the purely legal issue of what law was 'clearly established'." *Johnson v. Jones,* 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Consequently, "in order for an interlocutory appeal to be appropriate, a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Shehee v. Luttrell,* 199 F.3d 295, 299 (6th Cir.1999).

■ Kenya Wilson has sought to establish through deposition and affidavit testimony that Alvin Wilson was suicidal both before and after his arrest on January 8, 2000; that anyone familiar with the circumstances of the situation would have realized those suicidal tendencies; that Fowlkes and Smith were made aware of the city policy to inform their superiors and the booking officials of the arrestee's psychological problems; and that the officers failed to comply with that directive.

The officers deny the facts offered to show that they recognized that Wilson was suicidal and that they were aware of the policy requiring them to notify appropriate individuals of his condition and present evidence in support of their position. Therefore, a dispute regarding material facts remains to be decided in this case, and the appeal by Fowlkes and Smith of the district court's denial of qualified immunity is premature.

■ In addressing the § 1983 liability of Officer Roberts. the district court differentiated that defendant's actions in this matter from the response made by Alan Edwards, the individual who monitored Roberts's negotiations with Wilson over the telephone. After reviewing the record, we are not persuaded that such a distinction can be maintained. In dismissing Edwards as a defendant, the district judge explained:

> While Edwards testified that he did not believe Wilson was suicidal, and [that an] individual in a stand-off situation often threatens suicide, it appears that Edwards, in Roberts' presence, communicated to Eddy that Wilson had put a gun to his head. From the record, it appears that Edwards was at best simply negligent in his perception of Wilson. Thus, Edwards is entitled to summary judgment based on qualified immunity. . . .

Even though Roberts claims that he did not believe Wilson was suicidal, and even though he did not personally inform the booking officer or his superior about potentially self-destructive actions taken by the gunman during the stand-off, Roberts was present when Edwards conveyed the same information that Roberts himself could have offered. Thus, the protection afforded Wilson by Edwards was also constructively provided by Roberts. The fact that the person to whom Edwards relayed the information took no additional action to ensure Wilson's safety is not attributable to any act or omission on Roberts's part. Because Roberts, through his acquiescence to the contents of Edwards's oral report to Eddy, constructively fulfilled his responsibilities under the City of Flint Police Department policies and procedures manual, we conclude that he should not now be subjected to potential liability for the failure of other individuals to do likewise.[3]

---

3. The plaintiff insists that summary judgment in favor of Edwards was improper because evidence regarding that defendant's knowl- edge of Alvin Wilson's suicidal tendencies is conflicting. Edwards did say that he did not consider Wilson suicidal and that he was un-

108

If Edwards cannot be said to have been deliberately indifferent to Wilson's plight. neither can Roberts. Rather, through his negotiating partner, Roberts's superior officer was made aware in a timely fashion of the threats made by Wilson against himself and others. We therefore conclude that summary judgment should have been granted in favor of Roberts on his request for qualified immunity.

### CONCLUSION

Of the numerous defendants named by Kenya Wilson as defendants in this proceeding, only three—Keith Roberts, Alfred Fowlkes, and John Smith—have challenged the summary judgment rulings of the district court. For the reasons set out above, we conclude that the appeals of Fowlkes and Smith must be DISMISSED for lack of subject matter jurisdiction. However, we further conclude that the district court's denial of summary judgment to Roberts must be REVERSED and this matter REMANDED for entry of judgment of dismissal as to him, on the basis of qualified immunity from suit.

MILLS, District Judge, concurring in part and dissenting in part.

Because defense counsel conceded all material facts at oral argument, I respectfully disagree with the majority insofar as it concludes that *Johnson v. Jones* bars the Court from exercising jurisdiction. *See id.*

I believe that the Court does have jurisdiction to hear the interlocutory appeal and should affirm the district court's deci-

sion to deny Officers Fowlkes and Smith's qualified immunity claims.

However, I do agree with the majority that Officer Roberts was entitled to summary judgment on his qualified immunity claim.

aware of any requirement to inform anyone of an arrestee's suspected psychological problems. Nevertheless, Edwards's notes on the negotiation with Wilson plainly indicate that Wilson was playing "roulette on [the] porch." Furthermore, the officer did in fact inform Eddy of Wilson's threats to himself and to

others. Thus, regardless of any internal conflict Edwards might have experienced concerning the likelihood that Alvin Wilson would harm himself, the officer did note the decedent's dangerous actions and informed his superior of them.